IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| BLAINE KEITH MILAM, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6:25-cv-267 |
| | § | (Death Penalty Case) |
| MICHEAL E. JIMERSON, | § | |
| Rusk County and District Attorney, | § | **Execution Date Scheduled** |
| Defendant. | § | **September 25, 2025** |

---

## DEFENDANT JIMERSON'S MOTION TO DISMISS
## WITH BRIEF IN SUPPORT

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division
Assistant Attorney General/
Assistant County Attorney
State Bar No. 24007052
*Counsel of Record*

P.O. Box 12548, Capitol Station Austin,
Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *tomee.heining@oag.texas.gov*
*Counsel for Defendant Jimerson*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. ii

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF THE CASE ................................................................................. 1

    I.    Fact of the Crime ......................................................................................... 1

    II.    Procedural History ...................................................................................... 2

    III.    Facts Relevant to the Instant Proceeding ............................................... 4

STATEMENT OF THE ISSUE ............................................................................... 8

SUMMARY OF THE ARGUMENT ........................................................................ 8

ARGUMENT .............................................................................................................. 9

    I.    Standard for Review ................................................................................... 9

        A.    Federal Rule of Civil Procedure 12(b)(1) ................................... 9

        B.    Federal Rule of Civil Procedure 12(b)(6) ................................. 10

    II.    Milam Fails to State a Claim for Relief. ................................................. 11

        A.    Texas postconviction discovery .................................................. 11

        B.    Milam fails the Osborne test. ....................................................... 13

        C.    Even assuming the validity of Milam's facts, he does not have a plausible actual innocence claim based on the DNA evidence in   question. . 18

    III.    Milam's Lawsuit is Time-Barred. ............................................................ 25

IV.    The *Rooker-Feldman* Doctrine Precludes Relief. ........................................... 27

V.    This Lawsuit Is Impermissible Mandamus.................................................. 28

VI.    Milam Cannot Stop His Execution Through This Lawsuit. ........................ 29

CONCLUSION......................................................................................................... 30

CERTIFICATE OF SERVICE ...................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*Alvarez v. Attorney General for Fla.*, 679 F.3d 1257 (11th Cir. 2012) ......................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................10

*Benchoff v. Fogal*, 576 F. App'x 117 (3d Cir. 2014) ....................................27

*Berry v. Epps*, 506 F.3d 402 (5th Cir. 2007) ..............................................29

*Bible v. Davis*, 739 F. App'x 766 (5th Cir. 2018).........................................29

*Bible v. Davis*, 2018 WL 3068804 (S.D. Tex. June 21, 2018) ....................29

*Bracy v. Gramley*, 520 U.S. 899 (1997) ......................................................17

*Brown v. Livingston*, 457 F.3d 390 (5th Cir. 2006) ....................................29

*California v. Texas*, 593 U.S. 659 (2021) ....................................................29

*Carson v. State*, 422 S.W.3d 733 (Tex. App.—Texarkana 2013, pet. ref'd) ...............2

*Coury v. Prot*, 85 F.3d 244 (5th Cir. 1996)..................................................9

*Cromartie v. Shealy*, 941 F.3d 1244 (11th Cir. 2019)................................14

*Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009)................Passim

*District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) .................26

*Elliott v. Foufas*, 867 F.2d 877 (5th Cir. 1989) ..........................................10

*Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996)......................18

*Ex parte Milam,* No.79,322-01 (Tex. Crim. App. Sept. 11, 2013) ...............2

*Ex parte Milam*, No. 79,322-02, 2020 WL 3635921 (Tex. Crim. App. July 1, 2020) .....

.................................................................................................................2, 3

*Ex parte Milam*, No. 79,322-04, 2021 WL 197088 (Tex. Crim. App. Jan. 15, 2021) ... 3

*Ex parte Milam*, No. 79,322-04, 2024 WL 3595749 (Tex. Crim. App. July 31, 2024)

.................................................................................................................................... 4

*Ex parte White*, 506 S.W.3d 39 (Tex. Crim. App. 2016) ............................................. 12

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) ...................... 27

*Harris v. Johnson*, 376 F.3d 414 (5th Cir. 2004) ....................................................... 29

*Hill v. McDonough*, 547 U.S. 573 (2006) ................................................................... 29

*Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss.*, 143 F.3d 1006 (5th Cir.

1998) .................................................................................................................... 9

*Howery v. Allstate Ins. Co.*, 243 F.3d 912 (5th Cir. 2001) ........................................... 9

*In re Blaine Milam*, 838 F. App'x 795 (5th Cir. 2020) ................................................... 3

*In re Embry*, 2016 WL 1179545 (Tex. App.—Dallas Mar. 28, 2016, no pet.) ............ 12

*In re Heaney*, 2016 WL 4272125 (Tex. App.—Austin Aug. 9, 2016, no pet.) ............ 12

*In re Katrina Canal Breaches Litig*, 495 F.3d 191 (5th Cir. 2007) ............................ 10

*In re Milam,* No. 20-40849 c/w No. 20-70024, 832 F. App'x 918 (5th Cir. 2021) ......... 3

*In re Texas Dept. of Crim. Justice*, 710 S.W.3d 731 (Tex. Crim. App. 2025) ...............

................................................................................................. 12, 13, 15, 16

*In re Sorrow*, 2016 WL 446858 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016, no

pet.) .................................................................................................................... 12

*In re State ex rel. Hicks*, 2023 WL 6074482 (Tex. Crim. App. Sept. 18, 2023) .......... 13

*Johnson v. Collier*, 137 F.4th 376 (5th Cir. 2025) ..................................................... 29

*Johnson v. De Grandy*, 512 U.S. 997 (1994) ............................................................. 27

*Lance v. Dennis*, 546 U.S. 459 (2006).................................................................27, 28

*Lee v. State*, 2003 WL 292320 (Tex. App.—Tyler Feb. 12, 2003, no pet.) ................12

*Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464 (5th Cir. 2004) ...........................................................................................................................10

*Milam v. Director, TDCJ-CID*, 2017 WL 3537272 (E.D. Tex. Aug. 16, 2017)............2

*Milam v. State*, 2012 WL 1868458 (Tex. Crim. App. May 23, 2012) .........................2

*Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015).................................................18

*Moye v. Clerk, DeKalb Cty. Superior Court*, 474 F.2d 1275 (5th Cir. 1973).............28

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000).....................................................17

*Nelson v. Campbell*, 541 U.S. 637 (2004) ................................................................30

*Neville v. Johnson*, 440 F.3d 221 (5th Cir. 2006) .....................................................30

*Ochoa v. Collier*, 802 F. App'x 101 (5th Cir. 2020) ..................................................28

*Pruett v. Choate*, 2017 WL 4277206 (S.D. Tex. Sept. 25, 2017) ...............................28

*Pruett v. State*, 2017 WL 1245431 (Tex. Crim. App. Apr. 5, 2017) ...........................12

*Ramming v. United States*, 281 F.3d 158 (5th Cir. 2001) ....................................9, 10

*Reed v. Goertz*, 136 F.4th 535 (5th Cir. 2025)................................................13, 14, 17

*Reed v. Goertz*, 598 U.S. 230 (2023) ........................................................................25

*Reese v. Livingston*, 453 F.3d 289 (5th Cir. 2006) ....................................................29

*Rhoades v. Martinez*, 2021 WL 4434711 (5th Cir. Sept. 27, 2021) ...........................27

*Rodriguez v. Holmes*, 963 F.2d 799 (5th Cir. 1992)..................................................25

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923) ....................................................26

*Russell v. Bd. of Trustees*, 968 F.2d 489 (5th Cir. 1992) ...........................................25

*Skinner v. Switzer*, 562 U.S. 521 (2011) ................................................................. 14

*Smith v. Johnson*, 440 F.3d 262 (5th Cir. 2006) ................................................... 29

*Staley v. State*, 420 S.W.3d 785 (Tex. Crim. App. 2013) ................................... 12

*State v. Patrick*, 86 S.W.3d 592 (Tex. Crim. App. 2002) ................................... 11

*Stockman v. Fed. Election Comm'n*, 138 F.3d 144 (5th Cir. 1998) ................... 9

*Voluntary Purchasing Groups, Inc. v. Reilly*, 889 F.2d 1380 (5th Cir. 1989) ............. 9

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017) ............................................... 25

*Whitaker v. Livingston*, 597 F. App'x 771 (5th Cir. 2015) ................................ 30

*White v. Johnson*, 429 F.3d 572 (5th Cir. 2005) ................................................. 29

*Wood v. Patton*, --- F.4th ---, 2025 WL 2237942 (5th Cir. Aug. 6, 2025) ............. 14, 16


**Statutes**

28 U.S.C. § 2244(b) ........................................................................................................ 17

42 U.S.C. § 1983 ........................................................................................................ 1, 7

Tex. Code Crim. Proc. Art. 11.071 § 5 ................................................................. 15, 18

Tex. Code Crim. Proc. Art. 11.073 .............................................................................. 3

Tex. Code Crim. Proc. art. 11.073(b)(2) .................................................................. 25

Tex. Code Crim. Proc. Art. 43.14 ............................................................................... 29

Tex. Code Crim. Proc. Art. 64.01(a-1) ...................................................................... 26

Texas Government Code § 411.153(a) ........................................................................ 5

**INTRODUCTION**

This is civil-rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff Blaine Keith Milam is a Texas death row inmate scheduled to be executed September 25, 2025. On July 18, 2025, Milam filed his complaint, seeking declaratory and injunctive relief compelling Defendant Micheal Jimerson, the Rusk County and District Attorney, to order the release of "a complete set of underlying DNA worksheets, bench notes, electropherograms, chain-of-custody logs, electronic data, and other laboratory records from DNA testing, . . . the results of which the State used as evidence against [Milam] at his 2010 criminal trial."[1] *See generally* Compl., ECF No. 1. Pursuant to the Court's expedited briefing schedule, ECF No. 6, Jimerson now respectfully moves to dismiss Milam's complaint for failing to state a claim upon which relief may be granted, as well as myriad procedural and jurisdictional defects.

**STATEMENT OF THE CASE**

**I.    Fact of the Crime**

Milam was convicted and sentenced to death in May 2010, for the capital murder of his fiancée's thirteen-month-old daughter, Amora Bain Carson. Amora was severely beaten, strangled, sexually mutilated with a foreign object, and had twenty-four human bitemarks covering her entire body in what the medical examiner called the worst case of brutality he had ever seen. 41 RR[2] 235–36. Milam and Amora's

---

[1]    This evidence is in the custody of the Southwestern Institute of Forensic Sciences (SWIFS), the laboratory that did the DNA testing. Compl. at 9.

[2]    "RR" refers to the Reporter's Record for Petitioner's 2010 trial, while "CR" refers to Clerk's Record, preceded by volume number and followed by page number.

mother, Jesseca Carson, initially denied culpability, but Milam eventually confessed to a jail nurse. As found by the Texas Court of Criminal Appeals (CCA), only Milam and Jesseca were with Amora at the time of her murder, and no other person has been implicated in this crime.[3] *See* 2 SHCR-02,[4] at 186–87, #58; 223, #160; *Ex parte Milam*, No. 79,322-02, 2020 WL 3635921, at *1 (Tex. Crim. App. July 1, 2020) (adopting findings, with limited exceptions).

## II.    Procedural History

The CCA affirmed Milam's conviction and sentence on direct appeal. *Milam v. State,* No. AP-76,379, 2012 WL 1868458, at *21 (Tex. Crim. App. May 23, 2012). He did not seek certiorari review. The CCA denied state habeas relief. *Ex parte Milam,* No. WR-79,322-01 (Tex. Crim. App. Sept. 11, 2013). A sister court of this district denied federal habeas relief and a certificate of appealability (COA). *Milam v. Director, TDCJ-CID,* No. 4:13-cv-545, 2017 WL 3537272, at *51 (E.D. Tex. Aug. 16, 2017). The Fifth Circuit also denied a COA. *Milam v. Davis,* 733 F. App'x 781 (5th Cir. 2018), *cert. denied,* 139 S. Ct. 335 (2018).

On January 7, 2019, eight days before his first scheduled execution date, Milam filed his second state habeas application—his first subsequent writ—and a motion for stay. On January 14, 2019, the CCA granted the stay pursuant to Article

---

[3]    Both were charged and convicted under the law of parties, after separate trials. 4 CR 933–41; *Carson v. State,* 422 S.W.3d 733, 737 (Tex. App.—Texarkana 2013, pet. ref'd).

[4]    "SHCR" refers to the Clerk's Record from one of four state habeas proceedings, preceded by volume number, followed by a dash and writ number, then page number.

11.071 § 5(a)(1), and remanded two claims for merits adjudication by the trial court: (1) whether Milam is entitled to relief under Article 11.073 of the Texas Code of Criminal Procedure because the current relevant scientific evidence related to the reliability of bitemark comparison contradicts expert opinion testimony presented and relied upon by the State at trial;[5] and (2) whether Milam's execution would violate the Eighth and Fourteenth Amendments because he is intellectually disabled. *Ex parte Milam,* No. WR-79,322-02, 2019 WL 1902209, *1 (Tex. Crim. App. Jan. 14, 2019). The CCA adopted the trial court's recommended denial of relief on July 1, 2020. *Ex parte Milam*, 2020 WL 3635921, at *1, *cert. denied, Milam v. Texas*, 141 S. Ct. 1402 (2021). Federal appeal was unsuccessful. *See In re Blaine Milam,* 838 F. App'x 795, 798–800 (5th Cir. 2020) (unpublished); *In re Milam,* No. 20-40849 c/w No. 20-70024, 832 F. App'x 918 (5th Cir. 2021), *cert. denied, Milam v. Lumpkin,* 142 S. Ct. 172 (2021). The trial court reset Milam's execution date for January 21, 2021.

On January 15, 2021, the CCA stayed the execution again and remanded a second subsequent writ application to the trial court for merits review of an intellectual disability claim. *Ex parte Milam,* No. 79,322-04, 2021 WL 197088, at *1 (Tex. Crim. App. Jan. 15, 2021). Following court-ordered reexamination by a new expert—which Milam opposed—and a two-day evidentiary hearing in the trial court, the CCA adopted the trial court's recommendation and again denied relief. *Ex parte*

---

[5]    Milam intends to raise this claim a second time in a third subsequent writ application and currently seeks evidentiary support to challenge the trial court findings, adopted by the CCA, referencing DNA evidence. *See* Compl. at 6–8.

*Milam,* No. 79,322-04, 2024 WL 3595749, at *1 (Tex. Crim. App. July 31, 2024), *cert. denied, Milam v. Texas,* 145 S. Ct. 1334 (2025). On May 21, 2025, the trial court signed the order setting Milam's third execution date for September 25, 2025.

## III.    Facts Relevant to the Instant Proceeding

On June 30, 2015, while Milam's first federal habeas petition was still pending, the Texas Department of Public Safety (DPS) issued a statement acknowledging errors in the FBI database used by DPS and other crime laboratories for calculating match statistics in criminal investigations since 1999, and offering to recalculate and report statistics previously reported in individual cases, if requested in writing. *See* Exhibit A. The undersigned emailed a copy of this statement to Milam's federal habeas counsel of record, Don Bailey, Jeff Haas, and Scott Smith, on July 22, 2015, *see* Exhibit A, but no recalculation was requested.

In 2018, Milam was appointed new federal habeas counsel—the Federal Public Defender's Office of the Northern District of Texas (FPDO). *See* Compl. at 6. In December 2018, the FPDO reviewed the prosecution files retained by the Office of the Attorney General (OAG), which assisted in the prosecution of this case, and obtained portions of the SWIFS DNA records pertaining to Milam's case. *See id.* Milam now asserts that "[t]he limited DNA records currently available reflect that SWIFS inconsistently applied its DNA testing protocols to the biological evidence in Milam's case, reflecting a biased testing strategy," and "[a]ccess to the complete DNA records could help Milam prove that SWIFS's conclusions that Milam could not be excluded

as a contributor to these samples are so unreliable that they should not have been admitted at trial." Compl. at 10–11.

Nevertheless, Milam did not seek a complete copy of these records from SWIFS until September 9, 2024—after two subsequent state habeas writs were filed and relief denied, including the 2019 writ raising the 11.073 claim referenced above. *See* Compl. at 8–9. SWIFS denied this request, after seeking ruling from the OAG pursuant to the Public Information Act, because the case-specific records maintained by SWIFS were confidential by law and could not be disclosed pursuant to Texas Government Code § 411.153(a). *See* Compl. at 9; *see also* Exhibit G.

 Not until after the State filed a motion seeking the third setting of Milam's execution date did Milam request a copy of the SWIFS records from the Rusk County District and County Attorney, Micheal Jimerson. Given the dilatory timing of the request, Jimerson declined to request a copy of the records from SWIFS for Milam's counsel. *See* Compl. at 9–10.

On April 16, 2025, Milam filed a motion in the trial court for discovery of DNA and serology records maintained by SWIFS. ECF No. 9-1. The State opposed on grounds that the trial court lacked jurisdiction to grant postconviction discovery when no proceeding was pending before the court. ECF No. 9-2. The trial court denied the motion on May 21, 2025. ECF No. 9-4.

On July 3, 2025, Milam filed a complaint with the Texas Forensic Science Commission (TFSC) against SWIFS, concerning "laboratory results and testimony in

the areas of serological testing and DNA analysis on samples collected from submitted evidence items and the body of the decedent" in this case. *See* Exhibit B.

On July 23, 2025, SWIFS issued a response to TFSC, addressing the concerns outlined in the complaint, finding all allegations of professional negligence or misconduct "unfounded." *See* Exhibit C, at 4–8. Notably, SWIFS repeatedly asserted: "To date, no request has been received by the laboratory for reinterpretation of DNA profiles in this case. It is our emphatic recommendation that the defendant request reinterpretation of the DNA evidence using the laboratory's revised procedures." Exhibit C, at 2; *see also id.* at 5, 7, 8. On July 29, 2025, the TFSC dismissed Milam's complaint against SWIFS "because the laboratory has recognized the need for reinterpretation of the DNA evidence pursuant to current protocols upon the request of a party. This is in accordance with the historical statewide DNA mixture review protocols adopted by the Commission for DNA mixture analyses performed during the time period(s) involved in the complaint." Exhibit D.

On July 30, 2025—ten years after it was first offered by DPS—Milam's counsel finally requested reinterpretation of four DNA profiles. *See* Exhibit E (Letter to SWIFS); Exhibit F (Aug. 4, 2025 email from SWIFS.). Milam also requested copies of SWIFS protocols and procedures, the electronic data generated during the prior testing and interpretation of the four samples, and the names of the individuals conducting the reinterpretation and review. Exhibit E. Milam also renewed the request for SWIFS's DNA case file and sought written clarification of a number of statements SWIFS made in its response to Milam's complaint. *Id.*

Because "standard procedure would be to reinterpret all DNA evidence in the case using SWIFS's updated guidelines for STR profile interpretation (issued 2/29/2016)," Stacy McDonald contacted Jimerson and the undersigned counsel to see if Jimerson wanted SWIFS to review all of the DNA evidence in this case. Exhibit F. Jimerson agreed. In an email to Milam's counsel, McDonald indicated, on August 4, 2025, that she will be conducting the reinterpretation, and will issue a report the week of August 11, 2025. She provided copies of the laboratory protocols to be used to perform the reinterpretation. *Id.* McDonald also stated:

> As you know, the laboratory is unable to provide you with the DNA records you requested. Please refer to [OAG] ruling OR2024-041972. Therefore, I am going to provide all DNA case records to the State, with the exception of the electronic DNA data files. The electropherograms for all DNA evidence tested is included in the supporting documentation packets for each DNA report. You should reach out to the State for access to these records.

Exhibit F. The results of this reinterpretation came in hours before the instant filing. Preliminary review only strengthens the State's case. The State will share with Milam what was received from SWIFS, which arguably moots this entire proceeding.[6]

On July 18, 2025, Milam filed the present Section 1983 complaint. This Court ordered Milam to file a More Definite Statement, *see* ECF No. 7, which he filed on August 6, 2025, ECF No. 9.

---

[6]    The relevant portion of the SWIFS report is attached as Exhibit H, however the entire SWIFS record contained more than 4,100 pages.

## STATEMENT OF THE ISSUE

Whether Milam's claims are subject to dismissal for lack of jurisdiction and failure to state a claim upon which relief can be granted?

## SUMMARY OF THE ARGUMENT

In a vague complaint almost entirely devoid of precedent, Milam asserts that "[o]nce the State elects to use forensic DNA evidence to obtain and preserve a conviction, due process requires that the prisoner be given procedures adequate to test the reliability of that evidence." Compl. at 11. Milam contends that Texas's "post-conviction review procedures vest total, unreviewable discretion in the District Attorney to withhold these records and provides no alternative judicial or administrative process to obtain them." *Id*. at 12. Milam proposes that the remedy for this alleged due process violation is a declaratory judgment and an injunction "compelling [Jimerson] forthwith to produce the requested DNA records and enjoining [Jimerson] from withholding those materials or otherwise obstructing [Milam]'s access to them." *Id*. at 13. However, even assuming the validity of his facts, Milam fails to show that he is entitled to relief under the lone case that he cites—*Dist. Atty's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009). Misrepresenting Texas's postconviction discovery scheme and having abjectly failed to take advantage of the discovery options previously available to him, Milam fails to show the Texas's procedures are fundamentally inadequate to vindicate any liberty interest he has in demonstrating his actual innocence. Moreover, Milam's complaint is either barred by the statute of limitations or is foreclosed by the *Rooker-Feldman* doctrine, and his

proposed remedy is impermissible mandamus. Milam further fails to demonstrate that any stay of execution is available to him, should he later request one. This Court should dismiss Milam's complaint and deny any motion for stay of execution.

## ARGUMENT

## I.    Standard for Review

### A.    Federal Rule of Civil Procedure 12(b)(1)

"It is incumbent on all federal courts to dismiss an action whenever it appears that subject matter jurisdiction is lacking." *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998). "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks statutory or constitutional power to adjudicate the case." *Home Builders Ass'n of Miss.*, *Inc. v. City of Madison*, *Miss.*, 143 F.3d 1006, 1010 (5th Cir. 1998) (citation omitted). The party seeking to invoke jurisdiction bears the burden of demonstrating its existence. *See Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001). "[T]here is a presumption against subject matter jurisdiction that must be rebutted by the party bringing an action to federal court." *Coury v. Prot*, 85 F.3d 244, 248 (5th Cir. 1996) (citation omitted). An action may be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) on any of three separate bases: (1) the complaint standing alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint, the undisputed facts, and the court's resolution of disputed facts. *Voluntary Purchasing Groups*, *Inc. v. Reilly*, 889 F.2d 1380, 1384 (5th Cir. 1989).

## B.    Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) tests only the formal sufficiency of the statement of a claim for relief and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming*, 281 F.3d at 161. "[T]he plaintiff's complaint [must] be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged." *Id*. (citing *Elliott v. Foufas*, 867 F.2d 877, 880 (5th Cir. 1989)). In analyzing a claim under Rule 12(b)(6), the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quotation omitted). However, "the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

"The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *In re Katrina*, 495 F.3d at 205 (quoting *Twombly*, 550 U.S. at 555). It is insufficient, then, to plead facts that are merely consistent with wrongful

conduct; a plaintiff must instead plead facts that plausibly suggest that he or she is actually entitled to relief. *Twombly*, 550 U.S. at 556–57.

## II.    Milam Fails to State a Claim for Relief.

Milam's complaint is wholly unsupported by the law or the facts. Milam offers no precedent supporting his complaint save *Osborne*—the only case he cites to support his argument. *See generally* Compl. Yet Milam fails *Osborne*'s two-part test for successfully showing a due process violation. Even assuming arguendo that Milam has a valid liberty interest in demonstrating his actual innocence, he fails to show the State's discovery procedures are fundamentally inadequate to vindicate that interest. Milam also cannot plausibly assert Texas's procedures are inadequate when he has utterly failed to take advantage of them.

Indeed, Milam misrepresents the procedures available to him. Discovery in Texas is not wholly prosecutor-controlled; rather, court involvement is simply limited to jurisdictionally permissible proceedings. Milam could have sought discovery of the evidence in question during trial, during his initial state habeas review, or following the CCA's authorization of his two subsequent state habeas applications. Milam failed to utilize available discovery procedures. Because Milam fails to show a due process violation and fails to state a claim upon relief should be granted, his meritless lawsuit should be dismissed.

### A.    Texas postconviction discovery

In Texas, the scope of postconviction discovery is jurisdictionally limited. "When a conviction has been affirmed on appeal and the mandate has issued, general

jurisdiction is not restored in the trial court." *State v. Patrick*, 86 S.W.3d 592, 594 (Tex. Crim. App. 2002) (plurality op.). Rather, "[t]he trial court has special or limited jurisdiction to ensure that a higher court's mandate is carried out and to perform other functions specified by statute, such as finding facts in a habeas corpus setting or . . . determining entitlement to DNA testing." *Id.* (citations omitted); *Ex parte White*, 506 S.W.3d 39, 51 (Tex. Crim. App. 2016); *Pruett v. State*, No. AP–77,065, 2017 WL 1245431, at *5 (Tex. Crim. App. Apr. 5, 2017) (not designated for publication) ("Once a trial court's general jurisdiction expires, it has only limited jurisdiction to carry out a higher court's mandate or to perform functions specified by law."). Jurisdiction derives from either the Texas Constitution or legislative enactments. *Staley v. State*, 420 S.W.3d 785, 795 (Tex. Crim. App. 2013) (citation omitted).[7]

The CCA recently explained how a trial court's jurisdiction to authorize discovery must be predicated on a statutorily valid proceeding. In *In re Texas Dept. of Crim. Justice*, the defendant's conviction was final, his state habeas application had been disposed of, and there were no pending proceedings before the trial court. 710 S.W.3d 731, 734 (Tex. Crim. App. 2025) ("Under that procedural posture, there

---

[7]     Various courts of appeals have likewise held that a trial court's jurisdiction is limited to the express language of a statute once the court has lost general jurisdiction. *In re Heaney*, No. 03–16–00491–CV, 2016 WL 4272125, at *1 (Tex. App.––Austin Aug. 9, 2016, no pet.) (not designated for publication); *In re Embry*, No. 5-16–00211–CV, 2016 WL 1179545, at *1 (Tex. App.—Dallas Mar. 28, 2016, no pet.) (not designated for publication); *In re Sorrow*, No. 14–16-00054–CR, 2016 WL 446858, at *1 (Tex. App.—Houston [14th Dist.] Feb. 4, 2016, no pet.); *Lee v. State*, No. 12–0–00272–CR, 2003 WL 292320, at *1 (Tex. App.—Tyler Feb. 12, 2003, no pet.) (not designated for publication). Once a trial court loses general jurisdiction, it only gains it back by statute, and it is limited to that expressly provided by the statute.

is nothing to confer jurisdiction on the trial court[.]"), 735–36 ("Any jurisdiction a trial court obtains post-finality must be conferred by the Texas Constitution or by statute, and any provision bestowing post-finality jurisdiction defines the scope of that jurisdiction." (citation omitted)). Despite this, the trial court entered a discovery order, which required TDCJ to provide access to the defendant for the purpose of obtaining a blood sample. *Id.* TDCJ filed a petition for writ of mandamus, and the CCA concluded mandamus relief was warranted because the trial court's "lack of jurisdiction [was] indisputable." *Id.*; *see also In re State ex rel. Hicks*, No. WR-95,092-01, 2023 WL 6074482, at *2–3 (Tex. Crim. App. Sept. 18, 2023) (granting mandamus relief and ordering trial court to rescind discovery order commanding the State to make its files available to inmate's counsel because the trial court lacked jurisdiction to enter such an order).

Accordingly, for a Texas convicting court to re-acquire jurisdiction over a case and allow discovery after it loses general jurisdiction, it must have statutory authorization, to include an initial state habeas application or a CCA-approved subsequent state habeas application. *In re TDCJ*, 710 S.W.3d at 737–38. Milam has already litigated his initial state habeas proceeding and two subsequent proceedings but does not have a currently pending CCA-approved subsequent state habeas application. In fact, he has no proceedings pending in state court at all.

### B. Milam fails the Osborne test.

"The Constitution does not recognize a 'free-standing right to DNA evidence.'" *Reed v. Goertz*, 136 F.4th 535, 543 (5th Cir. 2025) (quoting *Osborne*, 557 U.S. at 72).

And since there is also no Texas postconviction right to discovery outside initial or authorized subsequent state habeas applications, Milam must necessarily argue that his liberty interest is begotten from various rights to assert actual innocence under state law and essential to the realization of those rights. Compl. at 3. Yet, assuming arguendo this liberty interest exists, Milam fails to show the "State's postconviction relief procedures . . . are fundamentally inadequate to vindicate the substantive rights provided." *Id.* (quoting *Osborne*, 557 U.S. at 69). Indeed, there is "'slim room for the prisoner to show that the governing state law denies him procedural due process.'" *Id.* (quoting *Skinner v. Switzer*, 562 U.S. 521, 525 (2011)); *see Wood v. Patton*, --- F.4th ---, 2025 WL 2237942, at *4 (5th Cir. Aug. 6, 2025); *Cromartie v. Shealy*, 941 F.3d 1244, 1252 (11th Cir. 2019) ("Every court of appeals to have applied the *Osborne* test to a state's procedure for postconviction DNA testing has upheld the constitutionality of it."). Under *Reed* and *Osborne*, Milam fails to state a valid claim for relief even assuming that his facts are true.

**First**, Milam is flatly incorrect when he says that Texas has a "blanket, prosecutor-controlled nondisclosure policy" and that "[n]o mechanism for party-led discovery is provided." Compl. at 1. Texas has procedures for court-ordered discovery—Milam simply failed to avail himself of them. As noted, Milam could have requested discovery at trial when the convicting court had general jurisdiction over his case. He could have sought discovery on his 11.073 claim raised in his first subsequent writ authorized by the CCA. He also could have raised an actual

14

innocence claim in either of his previous subsequent state habeas applications and sought discovery on it.

In fact, Milam could still raise actual innocence in a subsequent state habeas application. The CCA is the gatekeeper for subsequent habeas applications under Texas's habeas scheme. *In re TDCJ*, 710 S.W.3d at 738. As explained by the CCA, "[t]o allow a convicted person to engage in a fishing expedition under the auspices of researching a claim that *might* fall within a § 5[8] exception so that he *might* file a subsequent application in the future would open the floodgates to anticipatory subsequent-application discovery requests, seriously compromising the legislative purpose of limiting the amount of post-conviction habeas litigation." *Id*. The CCA has explained:

> To the extent a habeas applicant might believe that discovery would help prove a claim that would meet a § 5 exception, such an applicant is not without a remedy. To obtain a remand to the trial court under § 5, an applicant must make a "prima facie showing," not prove his entire case. In such a prima facie showing, the habeas applicant must, in addition to showing previously unavailable evidence or law (or making a prima facie showing of meeting an innocence-gateway or punishment-gateway exception), "allege sufficient specific facts that, *if proven*, establish a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence."
>
> If a habeas applicant has a good faith basis for believing that discovery will yield evidence showing a constitutional violation, he can *file a subsequent habeas application* and allege in that application what discovery he needs, what he expects the discovery to show, why he expects the discovery to show it, and why he cannot get the evidence without the discovery order he seeks. He would also want to allege why

---

8    Tex. Code Crim. Proc. Art. 11.071 § 5 (restricting the consideration of subsequent state habeas applications with certain enumerated exceptions).

the evidence was unavailable when he filed his previous application or what new law was unavailable or why he meets the innocence-gateway or punishment-gateway exception. This Court can then consider those allegations in determining whether the habeas applicant has established a prima facie case of meeting § 5 that would justify remanding the case to the trial court for further proceedings.

*Id*. at 738–39 (footnotes omitted).

Milam has not tried to file a subsequent state habeas application raising an actual innocence claim and seeking discovery of the evidence in question. While exhaustion is not required in this context, "[i]t is difficult to criticize the State's procedures when [Milam] has not invoked them. . . . [I]t is [Milam]'s burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief. These procedures are adequate on their face, and without trying them, [Milam] can hardly complain that they do not work in practice." *Osborne*, 557 U.S. at 71 (citation omitted); *see Wood*, 2025 WL 2237942, at *4 (affirming dismissal of claim alleging Texas's postconviction DNA testing statute, Chapter 64, violates procedural due process where the plaintiff, *inter alia*, failed to "explain how the CCA has construed the statute"). Milam thus has a problem of his own making—he did not take advantage of the available discovery procedures. He has not been statutorily or arbitrarily denied all discovery at the whim of the prosecutor.

**Second**, Milam offers no precedent holding that the Texas postconviction discovery scheme is fundamentally inadequate because it does not force district attorneys to agree to unbounded discovery by the defendant.

[A]bsent some showing of bad faith or bad conduct, we cannot see how committing the custody of potentially exculpatory evidence to the state is fundamentally inadequate to vindicate the right to the possibility of

> postconviction testing that it offers—especially given the Supreme Court's emphasis that the power to define these contours is vested in the state legislature.

*Reed*, 136 F.4th at 545 (citing *Osborne*, 557 U.S. at 62). Moreover, "[i]t is not enough to disagree with how the state has elected to use its permissible discretion or to complain that it has misapplied its own standards. Instead, [Milam] would have to show that those standards are fundamentally unfair or unjust in some way." *Reed*, 136 F.4th at 546. The State elected to use its permissible discretion to refuse a dilatory discovery request untethered from any pending proceeding. Fundamental fairness does not require the State to accede to an unwarranted fishing expedition on the eve of Milam's execution date, especially when the DNA evidence is of marginal value.

*Third*, if Texas's postconviction procedures are unconstitutional, then so are the federal government's. Federal petitioners must receive circuit-level authorization before proceeding with new claims after their first writ proceeding. 28 U.S.C. § 2244(b). And federal petitioners must still demonstrate good cause for discovery. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997); *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000). Milam effectively says that he is allowed to conduct unbounded discovery independent of court authorization—more than a decade after trial—with no right of refusal from the State. There is no authority for such a limitless proposition. *Osborne*, 557 U.S. at 72 (noting that federal habeas discovery procedures are not inadequate); *see Morrison v. Peterson*, 809 F.3d 1059, 1068–69 (9th Cir. 2015) (rejecting challenge to California's forensic testing statute because Alaska's framework was "more restrictive" than California's); *Alvarez v. Attorney General for*

*Fla.*, 679 F.3d 1257, 1266 n.2 (11th Cir. 2012) (no due process offense where "Florida's DNA access procedures either mirror or are more applicant-friendly than the Alaska and federal statutes endorsed in *Osborne*").

**Fourth**, Texas's procedures are similar to the ones upheld in *Osborne*, where the Supreme Court found no fault with Alaska's general procedures to vindicate its state right to postconviction relief or even its specific treatment of DNA evidence. *Osborne*, 557 U.S. at 70. The Court noted that Alaska placed no time limits on DNA claims, and discovery was allowed in postconviction proceedings. Texas also recognizes a substantive actual innocence claim, has no habeas statute of limitations, and allows postconviction factual development. *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996); Tex. Code Crim. Proc. Art. 11.071 § 9. The *Osborne* Court additionally condoned restrictions based on availability, diligence, and materiality. 557 U.S. at 70. Milam, of course, has not been diligent, seeks previously available evidence, and cannot show that the DNA evidence was material to his conviction. To the extent that Milam has been denied discovery on any of these bases, that is consistent with *Osborne*.

Rather than supporting Milam's arguments, *Osborne* emphatically refutes them. Milam fails to state a claim upon which relief can be granted.

### C.   Even assuming the validity of Milam's facts, he does not have a plausible actual innocence claim based on the DNA evidence in question.

Milam anticipates presenting an actual innocence claim, reurging his Article 11.073 claim involving bitemark evidence, and invoking Texas's actual innocence gateway to obtain consideration of other yet-disclosed habeas claims. Compl. at 8.

Milam seeks to review SWIFS data in the hopes of demonstrating that SWIFS's conclusion that he could not be excluded as a contributor of four mixed DNA samples taken from bitemarks on Amora's body, as well as other evidentiary samples, are so unreliable that they should not have been admitted at trial. Compl. at 11. Milam believes this evidence will prove his actual innocence of her brutal murder. He is wrong.

It is beyond question that Milam and Jesseca are responsible for Amora's brutal murder—whether individually or as parties.[9] Amora was found dead in Milam's home, and he and Jesseca were the only people in the house with Amora in the hours before her dead body was reported to the police. 44 RR 138–40. They were seen with Amora at 9 p.m. the night before the murder, 46 RR 96; and Milam called his sister before 9:30 a.m. the next day to tell her Amora was dead, 40 RR 180–82. Despite calling his sister at 9:30 a.m., Milam did not call 911 to report Amora's death until after 10:37 a.m. 42 RR 103–15. Before finally calling 911, Milam and Jesseca went to a pawn shop, 42 RR 57–61; staged a crime scene in the house, 46 RR 180–83; and came up with a now-discredited alibi, 40 RR 113–23. Milam told several different versions of the events to investigators. *See* 39 RR 229–31 (admitted as States Exhibit "SX" 15); 59 RR SX F1 at 26-30, 33, 48–49 (pretrial hearing exhibit). Apart from now accusing each other of sole responsibility, no other person has ever been credibly

---

[9]    And even if, hypothetically, Milam was found guilty *only* through the law of parties, the evidence still fully supports this conviction.

implicated, and Milam does not do so now. *See* ECF No. 9, at 5–6 (Milam does not intend to rely upon DNA evidence of a third party to prove actual innocence).

Directly linking Milam to the crime was his confession to jail nurse, Shirley Broyles: "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. . . . My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca I love her." 40 RR 161–66.[10] In closing arguments, the State broke this confession down to its parts, explaining the importance and credibility of each word. *See* 48 RR 145–51. The State called this confession "monumental;" 48 RR 35–36; "unequivocal," and "a perfect gold standard confession," 48 RR 151. Milam's own words are damning.

Milam's clothing was forensically linked to Amora. Regarding the clothes Milam was wearing after discovery of Amora's body, the entire inside of Milam's shirt, the entire inside of his underwear, several spots on his jeans, the entire outside of one sock and part of the other, and Milam's entire jacket all tested presumptively positive for the presence of blood. 43 RR 39–42.[11] Amora's DNA was found on a sample

---

[10]    While Milam argues that he was merely covering for Jesseca—the actual perpetrator—his attempt to place sole responsibility on her rings hollow, especially considering the non-dental forensic evidence linking him to the murder. Further, the State has always argued that the two were parties to this crime. *See, e.g.,* 48 RR 26. Therefore, even if Milam was covering for Jesseca by claiming sole responsibility, it does not negate his own guilt for this murder.

[11]    While Jesseca's bra, shoes, shirt, pants, and jacket also tested presumptively positive for trace levels of blood, *see* 43 RR 33–39, the State has always maintained that Jesseca was a party to murder. The trace levels of blood found on her clothing do not negate the presumptively positive readings found on Milam's clothing.

taken from Milam's shirt, 43 RR 116–19, and a sample from the jeans he was wearing at arrest, 43 RR 119–20.

Further, Milam was observed at the pawn shop shortly before her body was reported wearing jeans that were too large and obviously did not fit him, 42 RR 75–76, while a smaller-sized pair of bloodstained jeans were found discarded in the room where Amora was murdered.[12] *See* 42 RR 201–04, 229–30; 43 RR 73–75, 130–31; 48 RR 28–29. The bloodstain on the smaller jeans was described as "rather large," 46 RR 177–78; *see also* 44 RR 129 ("Nothing involved in this case had as much [bloodstain] as that pair of pants."), and primarily confined to the lap-area of the jeans, 43 RR 75. Crime scene investigator Noel Martin testified that he collected those jeans because they had stains "consistent with contact transfer bloodstains," a blood-spatter term of art meaning that "a bloodstain or a blood-soaked object which contained liquid blood on it at the time came in contact with the blue jeans, transferring blood to the surface of the jean." 42 RR 203–204, 229–30 ("[A] bloodied object come into contact with these jeans[.]"); 46 RR 177–78 (agreeing "contact transfer" from "direct contact with a blood object"). Martin agreed, the "blood-soaked object" could be a child, 42 RR 204, and he expected to find Amora's blood on the jeans, 46 RR 178. DNA testing of a sample from the bloodstain did, in fact, match Amora. 43 RR 130–31. This evidence

---

[12]    Milam's weight was known to fluctuate. 39 RR 157; 44 RR 141–42.

strongly suggests the person wearing the jeans sat a bleeding Amora on his lap and later changed out of the bloody jeans.[13] 56 RR 121–22.

Milam also directed his sister, from jail, to remove evidence from under the house that was later connected by trace-evidence analysis to other incriminating crime-scene evidence.[14] Specifically, under the house, police found a pipe-wrench in a plastic bag that had been shoved through a hole in the floor of the master bathroom. 40 RR 204–07; 41 RR 28–29; 44 RR 49–50. Forensic analysis revealed the components of Astroglide on the pipe-wrench. 44 RR 153–54, 159–60.[15] A bottle of Astroglide, babywipes, and a blood-stained diaper were found in the room where Amora was murdered; the components of Astroglide were found on these items as well as on the diaper Amora was wearing. 40 RR 185–87, 195–200–07; 44 RR 49–50, 151–66. The diaper was removed in the autopsy to reveal Amora's mutilated vagina and rectum, which were torn to such an extent that there appeared to be one large opening instead of two, and injury perforated internally, extending into her body cavity. 41 RR 190–

---

[13]    In closing argument, the State referenced video footage shown to the jury demonstrating that Jesseca was wearing the same clothing the night before and the morning after Amora's murder, *see* 48 RR 27–28, thus refuting any argument that Jesseca had been wearing the blood-soaked jeans.

[14]    Milam's sister testified that he asked her to retrieve a blue cellphone from under the house, 40 RR 172–74, 185–87, 195–200; 52 RR 104; but no cellphone was found under the house.

[15]    While no blood was detected on the wrench, and no DNA profile obtained, 43 RR 50–52, 131, trial testimony revealed that silicone-based oil like that used in Astroglide is not water-soluble and would not wash off completely if put in water, 43 RR 174; 44 RR 166–67, while blood and DNA could wash off in water. 43 RR 166, 174.

92. According to the medical examiner the injury occurred hours before her death and was likely caused by insertion of an object other than a penis. 41 RR 191–96.

Regarding the DNA evidence now at issue, neither Milam nor Jesseca could be excluded as a contributor of the DNA on four of the samples swabbed from the numerous bitemarks on Amora's body. 43 RR 133–38. On one of those samples taken from Amora's left elbow (No. 20I), the majority of the genetic markers corresponded to Milam with a statistical probability of 1 in 27,000 Caucasians, 1 in 43,600 African-Americans, and 1 in 47,200 Hispanics. 43 RR 136–137, 183–86.[16] While Jesseca also could not be excluded, the probability of her being a contributor was much less—1 in 123 Caucasians, 1 in 72 African-Americans, and 1 in 105 Hispanics. 43 RR 137. While Milam has always downplayed the significance of this DNA, *see* Compl. at 4, the CCA found it relevant given they were the only two people with Amora on the night of her murder, and Milam now blames Jesseca. Thus, the DNA evidence taken from injuries on Amora's body strongly points to Milam as the contributor, rather than Jesseca. *See* 2 SHCR-02, at 191–95, #80; 226–27, #161(g).

Recent recalculation of the DNA only strengthens the State's argument. While recalculation of sample numbers 20A, 20Q, and 20R showed these samples as "N/A"

---

[16]    Milam contends this DNA could have been left when he attempted CPR, *see* Compl. at 7, but the state courts found this contention not credible. 2 SHCR-02, at 227, #161(g)(2). There is no reason to believe he actually attempted CPR. While the 911 operator walked Jesseca and Milam through the CPR steps, 42 RR 104–14, Milam told his sister that Amora was dead a full hour before he called 911, and Sgt. Roy testified that Amora was cold to the touch and completely stiff when he arrived, 39 RR 145-46, suggesting she had been dead for a while when 911 was finally called. Regardless, CPR does not explain the presence of DNA on her elbow.

meaning "Not Applicable. No non-victim genetic markers were detected; therefore, no conclusions were made," sample No. 20I, taken from Amora's left elbow, maintains that Milam could still be included as a contributor, but now with a statistical probability of 1 in 492,000—significantly higher than the statistical probabilities attested to at trial. Exhibit H, at 7–8. Further, Jesseca is now excluded entirely. And, upon the State's request, sample No. 20C—a swab from Amora's chin that was not discussed at trial—was recalculated, including Milam with a statistical probability of less than 1 in 10 trillion, while Jesseca was excluded. Exhibit H, at 7. The DNA evidence links Milam to these bitemarks even more convincingly. But it is one piece of evidence supporting conviction, and certainly not the deciding factor in determining his guilt. *See* 2 SHCR-02, at 186–92, #57–80; 223–28, #160–64.

Furthermore, as found by the CCA, *still admissible* expert testimony from two forensic odontologists—including a defense expert, confirmed on peer-review by a third, indicated that Milam could not excluded as a contributor of at least two of the twenty-four bitemarks, possibly more. *See* 2 SHCR-02, 178–86, ##23–57; 218–23, ##141–60. Despite Milam's protestations, this evidence is still admissible.[17]

---

[17]    The American Board of Forensic Odontology Revised Standards and Guidelines for Evaluating Bitemarks (ABFO Standards), has not been revised since Milam's 2019 subsequent writ, and still permits limited testimony on bitemark evidence.    *See*    https://abfo.org/resources/id-bitemark-guidelines/    (citing chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://abfo.org/wp-content/uploads/2012/08/ABFO-Standards-Guidelines-for-Evaluating-Bitemarks-Feb-2018.pdf (Last checked August 12, 2025)).

While the bitemark testimony and DNA results including Milam as a contributor to four of those bitemarks were inculpatory, the very existence of twenty-four bitemarks on this child's bruised, battered, tortured, and mutilated body, coupled with the circumstantial evidence implicating Milam in this brutal murder, his considerable efforts to cover up his involvement and hide evidence after the fact, and his confession were all indicative of his guilt. As noted, Milam and Jesseca were the *only two people* who could have inflicted these injuries upon Amora the night of her murder. If bitemark testimony and DNA were excluded altogether, Milam still could not demonstrate, by a preponderance of the evidence, that he would not have been convicted as either the primary perpetrator or as a party to this capital murder. Tex. Code Crim. Proc. art. 11.073(b)(2); *see also* 4 CR 934 (jury charge on capital murder instructing jury to find beyond a reasonable whether, acting alone or as a party, Milam caused Amora's death). Any actual innocence claim will fall short.

## III.    Milam's Lawsuit is Time-Barred.

Because § 1983 has no statute of limitation, Texas' two-year statute for personal-injury actions governs this challenge. *Reed v. Goertz*, 598 U.S. 230, 235 (2023); *Whitaker v. Collier*, 862 F.3d 490, 494 (5th Cir. 2017). The limitations period for a § 1983 claim "begins to run 'the moment the plaintiff becomes aware he has suffered an injury or has sufficient information to know that he has been injured.'" *Russell v. Bd. of Trustees*, 968 F.2d 489, 493 (5th Cir. 1992) (quoting *Rodriguez v. Holmes*, 963 F.2d 799, 803 (5th Cir. 1992)). Here Milam had sufficient information to know of his alleged injury when the State presented DNA evidence at trial. If Milam

claims his injury was not known until he was notified of the DPS recalculation issue in 2015, Exhibit A, or he obtained records through a review of the OAG files in 2018, Compl. at 6, he would still be time-barred. If he claims the CCA's adoption of findings on his subsequent writ on July 1, 2020, constitutes his injury, he is still time-barred. *Id*. at 7. Milam has been on notice of the DNA evidence and the State's view that it may provide some marginal inculpatory value for well over two years.

Milam may assert that he is timely under the Supreme Court's recent decision in *Reed v. Goertz*, holding that "when a prisoner pursues state post-conviction DNA testing through the state-provided litigation process, the statute of limitations for a § 1983 procedural due process claim begins to run when the state litigation ends." 598 U.S. at 237. However, unlike Reed, Milam does not seek "state post-conviction DNA testing through the state-provided litigation process" by filing a Chapter 64 application. Tex. Code Crim. Proc. Art. 64.01(a-1); *see* ECF No. 9, at 6. Rather, he seeks discovery of evidence that may eventually lend support to claims raised in a future subsequent state habeas application. But there is no mechanism to appeal postconviction discovery rulings untethered to an initial or authorized subsequent state habeas application, because Texas state courts have no jurisdiction to entertain such freestanding requests. *Reed* provides no avenue.

Milam may also claim that the statute of limitations began running on the date Jimerson refused his request. However, Milam cannot have it both ways. As shown below, if Milam wishes to contest the district attorney's decision as opposed to the Texas statutory scheme, then he may evade the time bar, but he simply pleads

26

himself into the *Rooker-Feldman* doctrine and makes his requested relief improper mandamus. Moreover, even if the time bar is not applicable due to technical accrual reasons, the fact is Milam could have pursued this evidence through the appropriate channels years ago. His dilatoriness will thus preclude any stay of execution.

## IV.    The *Rooker-Feldman* Doctrine Precludes Relief.

The *Rooker–Feldman* doctrine, which emerged from the Supreme Court's decisions in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), prohibits "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejections of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). When *Rooker–Feldman* applies, "lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 463 (2006).

Here, Milam contested the district attorney's decision not to turn over evidence in the convicting court. He lost. He now "seek[s] what in substance would be appellate review of the state judgment in a United States district court, based on [his] claim that the state judgment itself violates [his] federal rights.'" *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994). The *Rooker–Feldman* doctrine thus precludes Milam's lawsuit, which effectively asks this Court to sit as an appellate court over the convicting court. *Benchoff v. Fogal*, 576 F. App'x 117, 118–19 (3d Cir. 2014) (applying *Rooker-Feldman* doctrine where state court ruled it did not have jurisdiction to rule

on postconviction motions and plaintiff sought declaratory relief that the ruling was incorrect).

To the extent Milam is challenging the district attorney's decision not to facilitate discovery rather than making a facial challenge to Texas's statutory framework governing postconviction discovery, then that decision has already been challenged in the state trial court and rejected. *See* ECF No. 9-4. Appeal of that decision via § 1983 is precluded. And any appeal from the state court's jurisdictional decision would obviously run to the CCA. Milam's lawsuit should thus be dismissed under the *Rooker-Feldman* doctrine. *Rhoades v. Martinez*, No. 21-70007, 2021 WL 4434711, at *2 (5th Cir. Sept. 27, 2021) (applying the *Rooker-Feldman* doctrine to a challenge to a state trial court's jurisdictional decision).

## V.    This Lawsuit Is Impermissible Mandamus.

Milam seeks to force Jimerson to turn over evidence or facilitate the same. Compl. at 9, 13. Accordingly, Milam's lawsuit is an improper request for mandamus relief by way of a federal court appeal of the convicting court's rulings. *See Lance*, 546 U.S. at 463 (an "aggrieved litigant cannot be permitted to do indirectly what he no longer can do directly" (quotation omitted)); *see also Moye v. Clerk, DeKalb Cty. Superior Court*, 474 F.2d 1275, 1276 (5th Cir. 1973) ("[A] federal court lacks the general power to issue writs of mandamus to direct state courts and their judicial officers in the performance of their duties where mandamus is the only relief sought."); *Ochoa v. Collier*, 802 F. App'x 101, 105 (5th Cir. 2020) ("[F]ederal courts do not have jurisdiction to issue the writ against a state actor or state agencies.").

Here, "[t]he only relief [Milam] seeks is an order compelling Texas officials to comply with what [Milam] sees as the requirements of [state law], or to act so as to allow [Milam] to independently effectuate his rights under [state law]. Regardless of how [Milam] chooses to characterize this relief, it is, at its core, mandamus." *Pruett v. Choate*, H-17-2418, 2017 WL 4277206, at *5 (S.D. Tex. Sept. 25, 2017). The Court should not entertain Milam's attempt to micro-manage the district attorney. *See Johnson v. Collier*, 137 F.4th 376, 382 (5th Cir. 2025).

## VI.    Milam Cannot Stop His Execution Through This Lawsuit.

While Milam does not ask for a stay in his complaint, the immediacy of his execution date suggests that a stay motion may be forthcoming. The Court should deny it. Even assuming Milam has a valid cause of action, the mechanism by which this lawsuit could stay his execution date is uncertain. A Texas district attorney has no authority to independently withdraw an execution date or stop an execution. Rather, TDCJ is the state agency statutorily responsible for carrying out an execution. Tex. Code Crim. Proc. Art. 43.14. "Remedies . . . ordinarily operate with respect to specific parties." *See California v. Texas*, 593 U.S. 659, 672 (2021) (quotation marks and citation omitted). TDCJ is not a party to this action, and thus no stay is available.

Furthermore, Milam's dilatoriness requires summary denial of any stay request. "The federal courts can and should protect States from dilatory or speculative suits[.]" *Hill v. McDonough*, 547 U.S. 573, 554 (2006). This Court should heed the Supreme Court's exhortation. The Fifth Circuit has previously endorsed the

denial of a stay of execution based solely on a lack of timeliness, independent of other factors, without considering the merits of the underlying claims. *See Bible v. Davis*, No. 4:18-CV-1893, 2018 WL 3068804, at *5 (S.D. Tex. June 21, 2018); *Bible v. Davis*, 739 F. App'x 766, 770 (5th Cir. 2018); *see also Berry v. Epps*, 506 F.3d 402, 404–05 (5th Cir. 2007) (per curiam); *White v. Johnson*, 429 F.3d 572, 573–74 (5th Cir. 2005) (per curiam); *Harris v. Johnson*, 376 F.3d 414, 417 (5th Cir. 2004) (per curiam); *Brown v. Livingston*, 457 F.3d 390, 391 (5th Cir. 2006); *Smith v. Johnson*, 440 F.3d 262, 263–64 (5th Cir. 2006); *Reese v. Livingston*, 453 F.3d 289, 290–91 (5th Cir. 2006); *Neville v. Johnson*, 440 F.3d 221, 222–23 (5th Cir. 2006) (per curiam). Inmates who dilatorily raise previously available claims immediately before their execution are not entitled to a stay regardless of whether they state a cognizable claim under § 1983.

Should Milam make a dilatory attempt at obtaining a stay of execution, this would be precisely the sort of attempt the Supreme Court has cautioned against. *Nelson v. Campbell*, 541 U.S. 637, 649–50 (2004). Dilatory tactics should not be countenanced, and Milam is not entitled to a stay at this late date. *Id.*; *see Whitaker v. Livingston*, 597 F. App'x 771, 774 (5th Cir. 2015). This Court should deny any stay solely based on lack of timeliness without considering the merits.

## CONCLUSION

For the foregoing reasons, Defendant Micheal Jimerson asks that the Court dismiss Milam's lawsuit.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

TOMEE M. HEINING
Chief, Criminal Appeals Division


s/ Tomee M. Heining

*Attorney-in-charge        *TOMEE M. HEINING
Chief, Criminal Appeals Division /
Assistant County Attorney
State Bar No. 24007052
P.O. Box 12548, Capitol Station Austin, Texas
78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: tomee.heining@oag.texas.gov

ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I do hereby certify that on August 13, 2025, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Jeremy Schepers
Supervisor, Capital Habeas Unit
Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
Email: jeremy_schepers@fd.org

Emily Follansbee & Jared Tyler
Texas Defender Service
P.O. Box 82236
Austin, TX 78708
Email: efollansbee@texasdefender.org; jptyler@texasdefender.org

s/ Tomee M. Heining
TOMEE M. HEINING
Chief, Criminal Appeals Division /
Assistant County Attorney