IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| Blaine Keith Milam, | § | Civil Case No. 6:25-cv-267 |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| Micheal E. Jimerson, Rusk County | § | **Execution Scheduled for Sept. 25, 2025** |
| & District Attorney, | § | |
| *Defendant*. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT JIMERSON'S MOTION TO DISMISS**

JASON D. HAWKINS
Federal Public Defender

Jeremy Schepers*
Supervisor, Capital Habeas Unit
Texas Bar No. 24084578

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

Counsel for Plaintiff
*Lead Attorney*

EMILY FOLLANSBEE
Texas Bar No. 24124283
efollansbee@texasdefender.org

JARED TYLER
Texas Bar No. 24042073
jptyler@texasdefender.org

TEXAS DEFENDER SERVICE
P.O. Box 82236
Austin, TX 78708
Tel: 512-320-8300
Fax: 512-477-2153

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

    I.    Milam States a Claim for Relief ........................................................................ 1

        A.    The "Osborne Test" ................................................................................. 1

        B.    The Defendant Has Already Made the DNA Evidence Necessary to Milam's Innocence Showing ................................................................. 8

    II.    The Suit Was Filed Within the Limitations Period ......................................... 12

    III.    The *Rooker-Feldman* Doctrine Has No Application to this Case ........................ 13

    IV.    This Lawsuit Is a Civil Action Under 42 U.S.C. § 1983 ...................................... 17

CONCLUSION .................................................................................................................. 18

CERTIFICATE OF SERVICE ......................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. State,*
  607 S.W.2d 551 (Tex. Crim. App. 1980)...............................................................8

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne,*
  557 U.S. 52 (2009)...........................................................................................1, 7, 8

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,*
  544 U.S. 280 (2005)..............................................................................................14

*Gutierrez v. Saenz,*
  606 U.S. ___, 145 S. Ct. 2258 (2025)...................................................................14

*Hall v. Florida,*
  572 U.S. 701 (2014)..............................................................................................10

*Hutto v. Finney,*
  437 U.S. 678 (1978)..............................................................................................17

*Johnson v. De Grandy,*
  512 U.S. 997 (1994).......................................................................................14, 16

*Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N. C.,*
  452 U.S. 18 (1981).............................................................................................7, 8

*Ex parte Milam,*
  No. WR-79,322-02 (Tex. Crim. App. July 1, 2020).............................................3, 4

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)................................................................................................18

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.,*
  9 F.4th 247 (5th Cir. 2021) ..................................................................................13

*Reed v. Goertz,*
  598 U.S. 230 (2023)..........................................................................12, 13, 14, 15

*Skinner v. Switzer,*
  562 U.S. 521 (2011).....................................................................................14, 15, 17

*State v. Milam,*
  No. CR09-066 (4th Dist. Ct. May 4, 2010) .....................................................10, 11

*Ex parte Young*,
   209 U.S. 123 (1908).................................................................................17, 18

**Statutes**

42 U.S.C. § 1983.............................................................................14, 15, 17, 18

Tex. Code Crim. Proc. art. 11.071 ...........................................................2, 3

Tex. Code Crim. Proc. art. 38.35 ...............................................................9

Tex. Code Crim. Proc. art.11.073 ........................................................2, 8, 9

Tex. Penal Code § 7.02(a)..........................................................................9

### I.    Milam States a Claim for Relief

District Attorney Jimerson argues Milam fails to state a claim for relief. *Osborne* holds that a State's postconviction relief procedures violate due process if they are fundamentally inadequate to vindicate the substantive rights provided. *Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 69 (2009). To state a claim for relief under the Due Process Clause, a plaintiff must allege (1) the existence of a life, liberty, or property interest (the substantive right); and (2) the deprivation of a process that is adequate to vindicate the rights provided under the circumstances. Milam has alleged both elements.

First, the Supreme Court has already recognized that state laws which afford convicted defendants an opportunity to obtain relief from their criminal judgments by showing they are innocent have a liberty interest in demonstrating innocence. *Osborne*, 557 U.S. at 68. Milam also asserts that he retains a life interest until his execution and that, in any event, Texas has created a life interest by permitting an individual to prevent his execution by a showing of actual innocence; however, he need go no further than pointing to *Osborne* and the Texas statute.

Second, Milam has alleged that Texas's post-conviction evidence-access regime has failed to adequately protect his life and liberty interests under the circumstances of his case, i.e., that process due to him in light of the nature of his interest and under the totality of the circumstances has not been afforded. Specifically, the procedures available—procedures which include giving the district attorney unfettered discretion about whether to disclose evidence—have denied him access to evidence in the State's possession—DNA records—that he knows exists and which he asserts may aid him in demonstrating his innocence.

### A.  The "Osborne Test"

Defendant District Attorney Jimerson argues that Milam fails the "Osborne test" because (1) Texas provides court-supervised avenues for discovery and subsequent actual-innocence

claims; (2) due process does not compel prosecutor-independent, open-ended post-conviction discovery; (3) condemning Texas's scheme would also implicate analogous or stricter federal and other states' regimes that courts have repeatedly upheld; and (4) Texas's system mirrors features the Supreme Court approved in Alaska—no time bar on such claims, recognition of actual innocence, and allowance for factual development—with permissible limits based on diligence, availability, and materiality.

First, District Attorney Jimerson appears to argue that Milam fails to state a claim for relief because Texas has procedures for discovery. The Defendant, however, does not deny Milam's allegation that Texas's post-conviction regime does not allow for party-led, post-conviction discovery. He admits that Milam therefore depends upon the State for access to evidence in its possession after conviction. And he takes the position that district courts lack jurisdiction to enter orders after appeal in cases except in narrow circumstances (discovery not being one of them).[1]

The Defendant contends, however, that Milam "could have sought discovery on his 11.073 claim raised in his first subsequent writ authorized by the CCA." This is incorrect. Although Texas permits factual development in a habeas corpus proceeding brought pursuant to Texas Code of Criminal Procedure Article 11.071, under § 9(a) court approval is required to conduct it. More to the point, Milam had no opportunity for fact development with respect to his first subsequent habeas corpus application. The "11.073 claim" refers to Milam's claim raised pursuant to Texas

---

[1] Milam does not deny that Texas courts have limited jurisdiction over a criminal case after finality—and he does not complain about the district court's lack of jurisdiction per se. In this case, not only the district court, but also Defendant himself, represents the State of Texas. For purposes of the due process clause, Defendant District Attorney Jimerson's acts and omissions are Texas's acts and omissions every bit as much as the district court's acts and omissions are Texas's acts and omissions. And, here, District Attorney Jimerson has unfettered discretion to afford Milam access to the evidence he seeks. Milam's complaint encompasses not only Texas's post-conviction procedural regime, but Defendant District Attorney Jimerson's exercise of discretion to withhold evidence from him as part of that scheme.

Code of Criminal Procedure Article 11.073 that new scientific evidence demonstrated the bite mark opinion testimony the State presented at his trial was unreliable junk science. He presented this claim in a subsequent habeas application filed on January 7, 2019. The Texas Court of Criminal Appeals authorized the claim as one that was previously unavailable to him and remanded it to the district court to hear and decide the facts. The Defendant filed an answer to that application on May 14, 2019. Twenty days later, the district court announced in a letter that it would be denying the application.[2] Letter from Judge Gossett to Counsel, 2nd Supp. CR at 115, *Ex parte Milam*, No. WR-79,322-02 (Tex. Crim. App. June 3, 2019). Two days later, Defendant District Attorney Jimerson proposed an order for the district court to sign formally finding that there are no "controverted, previously unresolved factual issues material to the legality of applicant's confinement." Order, *id*. at 116–17 (June 5, 2019). In other words, the Defendant asked the district court not to hear any evidence. On June 5, 2019, the district court signed the Defendant's proposed order ruling that it would not hold an evidentiary hearing.[3] *Id*. It subsequently verbatim adopted the findings of fact and conclusions of law proposed by the Defendant. Order, *id*. at 253–54 (Oct. 16, 2019).

In the 2019 application, Milam took the position that the DNA evidence in the case had no probative value and was immaterial to his conviction. App. for Writ of Habeas Corpus, 1 CR at 45, *Ex parte Milam*, No. WR-79,322-02 (Tex. Crim. App. Jan. 7, 2019). This is because Milam, Carson, and AC cohabited together and Milam and Carson were the child's caretakers: one would expect to find their DNA on each other and the presence of DNA does not say anything about when

---

[2] Milam unsuccessfully sought to recuse the district judge for prejudging the case.

[3] A Section 9 hearing is a hearing to adjudicate disputed facts in a habeas corpus proceeding in Texas. *See* Tex. Code Crim. Proc. art. 11.071, § 9. Milam unsuccessfully objected to the lack of process. *See* Applicant Blaine Milam's Objections to Denial of Due Process and the Trial Court's Recommendations, *Ex parte Milam*, No. WR-79,322-02 (Tex. Crim. App. Nov. 26, 2019).

the DNA was deposited or the activity that deposited it there.[4] *Id*. But the *Defendant* proposed, and the district court adopted, findings that Milam could not show his innocence notwithstanding the State's presentation of odontological junk science in part because of the DNA evidence the Defendant had presented at his trial. *See* State's Proposed Findings of Fact, Conclusions of Law, and Order, 2nd Supp. CR at 223–25, *Ex parte Milam*, No. WR-79,322-02 (Sept. 11, 2019); Order, *id*. at 253–54 (Oct. 16, 2019). Thus, it was the Defendant who made the DNA evidence material to Milam's ability to show his innocence, and he did so in a post-evidentiary posture of the habeas case that eliminated any opportunity for Milam to develop facts related to that question.[5] The Defendant's contention that Milam could have sought discovery on his 11.073 claim raised in his first subsequent writ authorized by the CCA is accordingly incorrect; rather, the Defendant successfully worked to preclude Milam from receiving any process during the proceeding.

Defendant District Attorney Jimerson argues that Milam could raise an actual innocence claim in a subsequent habeas corpus application now, pointing out that the CCA has held that a habeas applicant can "allege in an application what discovery he needs, what he expects the discovery to show, why he expects the discovery to show it, and why he cannot get the evidence without the discovery order he seeks." Motion to Dismiss at 15 (quoting *In re Texas Dept. of Crim. Justice*, 710 S.W.3d 731, 738–39 (Tex. Crim. App. 2025)). That the Texas courts invite prisoners to allege discovery needs in a habeas application only serves to prove Milam's contention that there is no mechanism for obtaining post-conviction evidence in Texas prior to filing a habeas application. Having an invitation to allege a discovery need—with no corresponding power to

---

[4] Trial evidence reflected Milam administered CPR to AC and that both he and Carson were hugging the child when paramedics arrived.

[5] The Court of Criminal Appeals subsequently denied relief based on the district court's findings in the case. *See* Order, *Ex parte Milam*, No. WR-79,322-02 (Tex. Crim. App. July 1, 2020) (not designated for publication).

obtain access to the information or evidence needed whether inside or outside of the proceeding—is hardly adequate to vindicate the right to prove one's innocence. This can significantly impair an innocent-but-convicted defendant's (like Milam) ability to make a prima facie showing of his innocence that is necessary for a subsequent habeas application to be authorized.

Milam's case is an example. Milam knows the information he seeks—DNA records created by SWIFS—exists. He has even seen much of SWIFS's file, perhaps at this point even the totality of the paper file. His review of the paper file has allowed him to identify deficiencies in the trial testimony from a SWIFS lab analyst. SWIFS has recently admitted those deficiencies were present; it has since reinterpreted the data and changed certain conclusions its analyst testified to at Milam's trial, but Milam has still identified problems with its recent reinterpretation.

Although Milam has SWIFS's paper file, he has not been given access to the electronic data created by SWIFS when it conducted its original testing—testing that its present reinterpretation still depends upon. The electronic data is important for Milam to review, because it plays a central role in Short Tandem Repeat (STR) testing and constitutes the test's results in their raw and least manipulated form. In contrast, the printed electropherograms found in the paper records are a result of extensive software editing and modification of the original data by the laboratory analyst using the software. Importantly, the electronic data file contains the critical diagnostic information pertaining to the injection of the sample onto the Genetic Analyzer which is not present in the printed electropherogram. A consulting expert cannot thoroughly evaluate the results of an STR test without having access to the test's underlying electronic data.

Review of electronic data often leads to the discovery of important problems or limitations in the STR testing, or to alternative theories of the evidence, that would not have been apparent based on a review of just the laboratory's reports, notes and electropherograms. Review of the

electronic data can also help identify other issues, such as previously unnoticed additional contributors to evidence samples, failures of essential controls, abnormalities in the running of the instruments used to perform the analyses, and/or the identification of the presence of technical artifacts.

Disclosure of the electronic data is particularly important in this case because a review of the printed electropherograms suggests that the Genetic Analyzer used to test the evidence in this case may have been malfunctioning, resulting in compromised DNA profiles. This type of malfunction is called an injection failure. The "red flag" for an injection failure is when the internal size standard peaks decrease in size from left to right. This is usually accompanied by a widening of the peaks left to right. This red flag appears to be present in the paper electropherograms Milam has been able to review, including for the sample the Defendant asserts "directly implicates" Milam.

Milam has identified serious concerns about SWIFS's reinterpretation of the DNA evidence, including SWIFS's reliance on certain DNA locations with very limited genetic data, and for which it is impossible to reliably determine the number of contributors. Reviewing the electronic data would allow Milam's experts to assess the scientific reliability of SWIFS's conclusion that Item 20I can reliably be interpreted, despite the uncertainty and incompleteness of the data.

Milam knows this information exists—thus it is not a "fishing expedition." He does not definitively know whether its appraisal will assist him in proving his innocence, but in light of the demonstrated (and admitted) deficiencies in the DNA testing Milam has identified to date, its review is warranted.

6

Second, District Attorney Jimerson argues that fundamental fairness does not require the State to accede to an "unwarranted fishing expedition." Motion to Dismiss at 17. Milam admits this, but he denies he is conducting an unwarranted fishing expedition. The State's experts have already admitted they made errors in the conclusions they formed from testing biological material for DNA in his case; Milam is trying to investigate the State's experts' admitted errors. As well, the Defendant's exercise of discretion may be unfettered under state law, but due process constrains it under this particular set of facts. Because the *Defendant* made Milam's post-conviction innocence showing in a capital case depend upon the DNA evidence it presented at trial, and because it has now admitted to forming flawed opinions from that testing, it can and does violate fundamental fairness for the Defendant to withhold relevant DNA evidence merely because he can.

Third, District Attorney Jimerson argues that Milam is not allowed to conduct "unbounded" discovery independent of court authorization and with no right of refusal from the State. Milam agrees, but the Defendant is misstating the claim. Milam does not seek "unbounded" discovery. He seeks particular evidence—the existence of which is known to him—that is relevant to *admitted* errors in DNA analysis in a case in which Defendant District Attorney has argued—and induced a court to conclude—that the DNA evidence prevents him from establishing his innocence. Under these circumstances, fundamental fairness requires that Milam be permitted to access all the DNA evidence the Defendant possesses or has control over.

Fourth, District Attorney Jimerson argues that Texas's procedures are similar to those in *Osborne*. Motion to Dismiss at 18. That may be so on their face, but Milam does not make a facial challenge. The process that is due any given individual before a deprivation of life, liberty, or property occurs always depends on the totality of the circumstances. *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N. C.*, 452 U.S. 18, 24 (1981) ("Applying the Due Process Clause is [] an

uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.").

While the *Osborne* court saw "nothing inadequate about the procedures Alaska has provided to vindicate its state right to postconviction relief in general," it noted it could not decide that Osborne himself had been deprived of due process because he filed his federal suit "without ever using these procedures." Had Milam known that the State would induce the state district court to make findings that the DNA evidence in his case prevented his making a showing of actual innocence under Article 11.073, he may have been able to make an attempt to obtain the evidence and scrutinize it then. But the Defendant and the state court denied him any opportunity to do so for the reasons stated above. Milam is therefore in a very different position from the *Osborne* petitioner. The inadequacy of the procedures available to him has already been laid bare.

**B. The Defendant Has Already Made the DNA Evidence Necessary to Milam's Innocence Showing**

The Defendant explains to this Court that Milam would still stand convicted even if all of its forensic odontological evidence—the evidence it told the jury was its "smoking gun" that Milam participated injured the child—*as well as* the DNA evidence were excluded from trial, calling the DNA evidence here of "marginal value."[6] Motion to Dismiss at 17. The Defendant appears to rest his argument primarily on the unstated assumption that presence is sufficient to prove guilt as a party in Texas. *Id*. at 19. This is, of course, not the law. *See Alexander v. State*, 607

---

[6] The Defendant's motion is contradictory in this regard. On the one hand, the DNA evidence is of "marginal value." On the other, Defendant heavily relies upon it to argue Milam's guilt. *See* Motion to Dismiss at 20–24.

S.W.2d 551, 553 (Tex. Crim. App. 1980) (mere presence at the scene of an offense is relevant evidence but not alone sufficient to support a conviction under Texas Penal Code § 7.02(a)).

Whether due process has been denied does not turn on the strength of Milam's innocence claim. But it is worth pointing out that the State presented excruciatingly little evidence at Milam's trial that he was guilty either as a principal or a party. The only forensic evidence it presented that actually connected Milam to any injury the child incurred was opinion testimony from a forensic odontologist derived from bite mark comparison analysis. Notwithstanding the Defendant's protests to the contrary, those opinions have been discredited in their entirety. Indeed, such opinion testimony is not admissible in Texas courts today, because admissibility of forensic evidence in Texas requires the analysis to have been done by an accredited laboratory. Tex. Code Crim. Proc. art. 38.35. The Texas Forensic Science Commission now maintains that bite mark comparison analysis "is not an accredited discipline" and, due to its lack of scientific validation, has not exempted it from the accreditation requirement. *See* Texas Forensic Science Commission, *Bite Mark Case Review Report* at 5, Nov. 3, 2017, https://www.txcourts.gov/media/1445768/bite-mark-review-report.pdf. Thus, neither prosecutors nor defendants can obtain admission of such opinions in a criminal trial in Texas held today.

In his 2019 state habeas application, Milam alleged that had new scientific evidence about the unreliability of opinions derived from bite mark comparison analysis been available to him at trial, the opinion testimony would have been excluded as junk science under Texas Rule of Evidence 702 and, as a result, he "would not have been convicted"—a necessary showing under Article 11.073. After successfully asking the district court to prevent Milam from presenting any evidence to prove his claim, the Defendant then induced the trial court to adopt proposed legal conclusions that provided, in part, that Milam could not show he would not have been convicted

absent certain odontological testimony because his clothing was "forensically linked" to the child "through blood and DNA evidence" and because he could not be excluded as a contributor to DNA samples taken from injuries on the child's skin.

Defendant *now* suggests that Milam would have been convicted even if none of its odontological *or* DNA evidence had been presented. This would leave the State only with Milam's vague admission in a jail cell that he did "it." But little to no weight can be placed on the alleged admission, because what the State hyperbolically touted at trial as the "perfect gold standard confession" was just a vague statement made to a county jail nurse on January 22, 2009. Moreover, it is most reasonably interpreted as an intellectually impaired person naively trying to take the blame for someone else (Carson)—something Milam openly contemplated doing in his interviews with authorities. *See Hall v. Florida*, 572 U.S. 701, 709 (2014) (intellectually impaired persons are "more likely to give false confessions").

The nurse testified that she was handing out medication to other prisoners when Milam, who was "pretty upset and crying," called her over. 40 RR 167, *State v. Milam*, No. CR09-066 (4th Dist. Ct. May 4, 2010). When she approached his cell, he handed the nurse a slip requesting to speak to lead investigator Amber Rogers. *Id*. at 165. According to the nurse, after handing her the slip Milam told her, "I'm going to confess. I did it. But Ms. Shirley, the Blaine you know did not do this. My dad told me to be a man, and I've been reading my Bible. Please tell Jesseca I love her." *Id*. at 165–66.

Milam had long been wrestling with whether to tell investigators the truth about what Carson had done or whether to take the blame for her. During his custodial interview on the day of arrest, Milam adamantly denied hurting AC. But during the interview he pleaded to speak to Carson and openly contemplated whether he should take the blame for what she had done:

> SERGEANT ROGERS: Jess is not going to come in here with us. Okay? That's not an option right now. Jess is not coming in here with us. I don't want Jess's side of this. Tell me what happened.
>
> BLAINE MILAM: I'm thinking if I should take it or -- how much trouble can you get in for taking the blame?
>
> SERGEANT ROGERS: Right now, right now, I need to know what happened.
>
> BLAINE MILAM: All right. And if I tell you, what if I tell you it was me and I take the blame for somebody else, will I be in trouble?

59 RR SX E-2.

A few days later, Milam requested to speak to investigators again. This time he appeared to have decided to tell investigators the truth about what happened, but he got cold feet, telling them, "I'm wanting to talk to my mama and Jessi. I want to talk to Jessi real bad. It's going to be real hard." 59 RR DX1, *State v. Milam*, No. CR09-066 (4th Dist. Ct. May 4, 2010). Milam did not want to tell the truth without getting Carson's blessing first.

Milam continued to wrestle with whether to tell the truth or take the blame for what Carson had done. On the occasion the county nurse testified about, he had apparently decided to take the blame. That is why, through tears, he requested to see the lead detective and why he told the nurse, "I'm going to confess." To Milam, taking the blame for what Carson had done was "being a man." The "confession" was a gesture of love, hence why he asked the nurse to tell Carson he loved her after giving the nurse the slip and telling her what he was going to do. Ultimately, Milam did not formally confess: the Defendant never presented any sworn, written statement signed by Milam admitting involvement in AC's death.

None of the other evidence the State recites connects Milam in any way to the offense: the State could not connect Milam to the bloody jeans nor to the wrench. It could not even connect the wrench to the offense (and explicitly told the jury that). 48 RR 31 ("Now, am I here to tell you that this is definitely the murder weapon, that this is what they killed Amora with, that this is what she

was penetrated with? No, I'm not."). AC's DNA was (unsurprisingly) on both Carson's and Milam's clothes, and even if both Carson's and Milam's DNA was (unsurprisingly) on AC's skin, this proves only that all of these individuals lived together and interacted with each other. Besides the discredited odontological testimony, the Defendant's case against Milam was entirely based on proving his presence at the trailer.

Deciding the Defendant's motion to dismiss does not require this Court to ascertain whether Milam is actually innocent or whether he can prove it. Any disagreement by the Defendant about whether Milam is innocent is not a basis for pleading-stage dismissal. At this stage, the Court need only determine whether Milam has stated a claim that Texas's post-conviction access-evidence procedures, as applied to him and the circumstances of his case, violate due process.

## II.    The Suit Was Filed Within the Limitations Period

District Attorney Jimerson asserts that Milam's suit is barred by the statute of limitations. This cannot be so, because the violation complained about is ongoing, not historical in nature. *See Reed v. Goertz*, 598 U.S. 230, 236 (2023) (a procedural due process claim "is not complete when the deprivation occurs" but rather is complete "only when 'the State fails to provide due process.'") (quoting *Zinerman v. Burch*, 494 U.S. 113, 125 (1990)). The relief Milam seeks is prospective in nature, not remedial.

Alternatively, if a limitations period has begun running, it would only have begun, at the latest, "when state litigation ends." 598 U.S. at 237. In this case, that would have been by the district court's denial of his discovery motion seeking access to the DNA records on May 21, 2025, well within the two-year limitations period.

To the extent the Defendant argues that Milam should have known of his injury in 2015, when "he was notified of the DPS recalculation issue," Motion to Dismiss at 26, this argument is tenuous because it ignores the ongoing nature of Milam's injury. Moreover, the State's reliance on

the DPS notification attached as Exhibit A to the Motion to Dismiss is misleading because it addresses an issue that is separate and distinct from the concerns Milam has identified regarding the reliability of DNA data and SWIFS's interpretations of the data. At the outset, in the email sending the notice to Milam's counsel, counsel for the State expressly stated that the notice relates to "DNA testing from DPS." Motion to Dismiss, Exhibit A. The DPS notice likewise indicates that, "If requested in writing, *the Texas DPS Crime Laboratory System* will recalculate and report statistics previously reported in individual cases." *Id.* (emphasis added). The DNA testing in Milam's case was performed by SWIFS, not by DPS. More importantly, the notice explains that it relates to "errors in the FBI-developed population database" and other "minor discrepancies" in data used by DPS, but states in bold print that "**the database corrections have no impact on the inclusion or exclusion of victims or defendants in any result**." *Id.* (emphasis in original). This is a separate issue from proper interpretation of DNA mixture samples. In short, the notice has no relevance to the problems that have been identified by Milam—including the unreliability of SWIFS's conclusions that Milam is *included* as a contributor to some of the items—which underlie Milam's need for the electronic data and the continuing harm that has been perpetuated by the Defendant's failure to furnish the data.

Finally, to the extent any factual dispute exists about when the limitations period began running, it is not resolvable by way of a motion to dismiss filed under Rule 12. *See Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 255 (5th Cir. 2021) (fact issues about whether limitations period has run "are not a proper basis for 12(b)(6) dismissal").

### III.    The *Rooker-Feldman* Doctrine Has No Application to this Case

District Attorney Jimerson invokes the *Rooker–Feldman* doctrine as a basis for dismissal. The Supreme Court has repeatedly emphasized the doctrine's narrowness: it is "confined" to a small class of cases in which a state-court loser complains of an injury *caused by* a state-court

judgment and asks the federal district court to "overturn" that judgment as a means of affording relief. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 291–94 (2005); *see also Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994) (describing the doctrine as prohibiting review of an action "seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that *the state judgment itself* violates the loser's federal rights" (emphasis added)). Plaintiff does not allege any injury caused by the trial court's order denying his motion for discovery. Nor does the relief requested—a federal declaration and (as appropriate) prospective orders directed to the Defendant custodian having control—seek revision or annulment of any state court order.

Rooker–Feldman applies only when (1) the plaintiff complains of injuries caused by a state-court judgment rendered before the federal suit began, and (2) the federal action invites review and rejection of that judgment. 544 U.S. at 284, 291–92. Both elements are missing. The alleged due-process injury is asserted to be caused by the totality of Texas's post-conviction evidence-access regime as it has operated in this case to thwart vindication of Milam's life and liberty interests in proving his innocence. And the requested relief neither reviews nor reverses the state court's denial of Milam's request that it order Jimerson to turn it over.

In *Skinner v. Switzer*, 562 U.S. 521 (2011), the Supreme Court held that a § 1983 claim seeking access to biological evidence in a district attorney's custody and control "encounters no *Rooker–Feldman* shoal," even though Texas courts had previously denied relief under a procedural mechanism specifically established to permit convicted defendants access to such evidence. 562 at 531–33. The Court has since reiterated that posture. *Reed v. Goertz*, 598 U.S. 230, 235 (2023). And, most recently in *Gutierrez v. Saenz*, 606 U.S. ___, 145 S. Ct. 2258 (2025), the Court again proceeded on the premise that federal jurisdiction exists to adjudicate a due-process challenge to

a state's post-conviction evidence-access regime, notwithstanding prior state-court decisions saying a convicted defendant was not entitled to it under state law. *See* 144 S. Ct. 2265–69. This time—having twice already rejected the argument in this context—the Court simply ignored the district attorney's protest that *Rooker-Feldman* stripped the federal court of subject-matter jurisdiction. These decisions control: a federal court may entertain a § 1983 claim that targets a State's post-conviction evidence-access regime even after unsuccessfully invoking state procedures to try to obtain the evidence.

Milam's suit, however, is even further removed from *Rooker-Feldman* than either *Skinner* or *Reed*. Like both Skinner and Reed, Milam sought an order from a state trial court permitting him to access certain evidence believed relevant to establishing his innocence. But that is where the similarities end. Unlike Milam, Skinner and Reed sought biological evidence. Because of that, they were able to, and did, invoke a specific state statute that jurisdictionally empowers Texas trial courts to order that access to biological evidence be granted to a convicted defendant. The statute also provides a mechanism for appealing a trial court's order denying access to biological evidence. Skinner and Reed were denied access by the trial court, appealed that decision to Texas's highest criminal court, and lost in an appellate decision culminating in a state court judgment. They then filed suit in federal court and asserted that the procedural regime as interpreted and applied by the state court violated due process in the circumstances of their case.

By contrast, Texas provides no mechanism for post-conviction discovery of *records* in the State's possession for a case in the posture of Milam's. Thus, when District Attorney Jimerson refused to disclose those records, Milam filed a post-conviction motion in the criminal case requesting that the trial court order him to disclose them. District Attorney Jimerson responded,

inter alia, that the trial court lacked jurisdiction even to hear Milam's post-conviction motion. The trial court thereafter denied the motion without providing reasons.

District Attorney Jimerson's brief argues that Milam "lost" a discovery effort in state court and now seeks what is "in substance" an appeal. But the appropriateness of the state trial court's order is entirely irrelevant to Milam's instant action; Milam does not allege it has caused him any injury. He alleges his injury is caused by Texas's post-conviction evidence-withholding regime as a whole, including its bestowal of unfettered discretion in District Attorney Jimerson to withhold the evidence from him. Whether Texas's post-conviction, evidence-access procedures under the circumstances of this case are adequate to protect Milam's life and liberty interests in proving his innocence was never raised nor litigated by Milam in any state court. Because of that, Milam cannot possibly be "appealing" anything. *See Johnson*, 512 U.S. at 1006 (denying applicability of *Rooker-Feldman*, in part, because the party had not "directly attacked" the state court judgment).

Ultimately, District Attorney Jimerson's motion itself settles the matter. District Attorney Jimerson argues *Rooker-Feldman* applies only "*[t]o the extent* Milam is challenging the district attorney's decision not to facilitate discovery." Motion to Dismiss at 28. Milam is challenging Texas's entire post-conviction evidence-access regime, but that regime includes bestowing unfettered discretion upon District Attorney Jimerson who exercises control over it. That discretion is bestowed regardless of the state court order denying Milam's motion for discovery.[7]

---

[7] Moreover, Milam does not agree with District Attorney Jimerson's contention that *Rooker-Feldman* would apply if he were only challenging District Attorney Jimerson's "decision not to facilitate discovery." This is because District Attorney Jimerson's decision not to afford access is *not* a state court judgment to which *Rooker-Feldman* applies. Texas gives District Attorney Jimerson independent discretion to afford or withhold access. If Milam were alleging the state *trial court's* decision *itself* operated to deprive him of due process, only then might he have a *Rooker-Feldman* problem.

The Supreme Court has already said that a § 1983 claim targeting a state's regime that denies access to evidence which may be relevant to proving innocence after state-court denials "encounters no *Rooker–Feldman* shoal." *Skinner*, 562 U.S. at 531. Defendant's *Rooker-Feldman* argument misidentifies the injury, misstates the relief, and overreads a narrow jurisdictional doctrine. It should be denied.

## IV.    This Lawsuit Is a Civil Action Under 42 U.S.C. § 1983

District Attorney Jimerson argues Milam's request for prospective relief compelling the district attorney to afford access to evidence is really an impermissible petition for mandamus against state actors. That mischaracterizes both the claim and the relief. Milam proceeds under 42 U.S.C. § 1983 seeking both injunctive and declaratory relief to end an ongoing federal constitutional violation. That is the heartland of *Ex parte Young*, 209 U.S. 123 (1908).

District Attorney Jimerson argues the suit is an improper request for mandamus *only* because one of the remedies sought—injunctive relief that would remedy the constitutional violation—would direct District Attorney Jimerson to provide access to the evidence. This boils down to an argument that federal courts never have power to issue injunctive relief against any state official, which is patently wrong. It directly contradicts *Ex parte Young* and transforms every suit seeking injunctive relief against any state official into a request for a writ of mandamus.[8]

Nowhere has Milam asserted an entitlement to mandamus relief. He has not alleged that District Attorney Jimerson has a ministerial duty under state law to turn over the DNA records;

---

[8] Defendant Jimerson's argument essentially says that any order directing any state official to do anything is an improper writ of mandamus. This argument would also mean that the writ of habeas corpus—a writ that directs state officials to release an individual from custody—is a disguised writ of mandamus that federal courts lack power to issue. As well, the injunction directing state prison officials how to run a prison in compliance with the Eighth Amendment that the Supreme Court enforced in *Hutto v. Finney*, 437 U.S. 678 (1978), is also an improper mandamus against state officials that the federal court lacked the power to issue.

rather, he has asserted that Texas's post-conviction evidence-access regime in the circumstances of his case—which includes but is not limited to Jimerson's exercise of discretion to afford or withhold access to evidence—violates due process. Jimerson's state-law ministerial duties are irrelevant to this action. Nor has Milam asserted that he has no adequate remedy at law; indeed, he has *invoked the law* available to him in this suit. Nor has Milam asked the Court to order District Attorney Jimerson to comply with any state law ministerial duty, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984); he has asked the Court to end an asserted, ongoing federal due process violation.

That an injunction against a state official having control and custody of evidence affords him relief from the constitutional violation does not transform his civil action brought pursuant to 42 U.S.C. § 1983 into a request for a writ of mandamus. No case cited by the Defendant suggests otherwise.

Milam is not seeking a writ to enforce ministerial duties imposed by state law; he seeks prospective, narrowly tailored relief against a state official to remedy an ongoing federal due-process violation. That claim lies squarely within § 1983 and *Ex parte Young*.

## CONCLUSION

The motion to dismiss should be denied.

Respectfully submitted,

DATE: August 22, 2025

JASON D. HAWKINS
Federal Public Defender

*/s/ Jeremy Schepers*
Jeremy Schepers*
Supervisor, Capital Habeas Unit
Texas Bar No. 24084578

Office of the Federal Public Defender
Northern District of Texas
525 S. Griffin St., Ste. 629
Dallas, TX 75202
214-767-2746
214-767-2886 (fax)
jeremy_schepers@fd.org

EMILY FOLLANSBEE
Texas Bar No. 24124283
efollansbee@texasdefender.org
JARED TYLER
Texas Bar No. 24042073
jptyler@texasdefender.org
TEXAS DEFENDER SERVICE
P.O. Box 82236
Austin, TX 78708
Tel: 512-320-8300
Fax: 512-477-2153

Counsel for Plaintiff
*Lead Attorney*

**CERTIFICATE OF SERVICE**

I certify that on August 22, 2025, I electronically filed the foregoing document with the

Clerk of the Court for the United States Court for the Eastern District of Texas using the electronic

case-filing (ECF) system of the Court, which will serve all registered users in this case.


*/s/ Jeremy Schepers*
Jeremy Schepers